**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

MICHAEL E. HOFFMAN,                     )          CASE NO. 3:16CV02648
                                        )
            Plaintiff,                  )          JUDGE JAMES G. CARR
                                        )
        v.                              )          MAGISTRATE JUDGE
                                        )          JONATHAN D. GREENBERG
NANCY A. BERRYHILL,                     )
        Acting Commissioner             )
        of Social Security,             )
                                        )
            Defendant.                  )          **REPORT AND
                                        )          RECOMMENDATION**

        Plaintiff, Michael E. Hoffman ("Plaintiff"), challenges the final decision of Defendant,

Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"), denying her

applications for Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and

Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42

U.S.C. §§ 416(i), 423, 1381 et seq. ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. §

405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an

automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons

---

[1]      On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of
Social Security

1

set forth below, the Magistrate Judge recommends that the Commissioner's final decision be VACATED and this matter REMANDED.

## I.  PROCEDURAL HISTORY

On June 28, 2013, Plaintiff filed applications for POD, DIB, and SSI, alleging a disability onset date of October 20, 2012.  (Transcript ("Tr.") 170, 177).  Plaintiff later amended his onset date to October 20, 2012.  (Tr. 272-73).  The applications were denied initially and upon reconsideration, and Plaintiff requested a hearing before an administrative law judge ("ALJ"). (Tr. 117, 128, 133).

On July 16, 2015, an ALJ held a hearing, during which Plaintiff, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 28).  On August 6, 2015, the ALJ issued a written decision finding Plaintiff was not disabled.  (Tr. 11-20).  The ALJ' s decision became final when the Appeals Council declined further review.  (Tr. 1-7).

On October 31, 2016, Plaintiff filed his Complaint to challenge the Commissioner's final decision.  (Doc. No. 1).  The parties have completed briefing in this case.  (Doc. Nos. 11, 13). Plaintiff asserts the following assignments of error:

(1)  The ALJ erred by assigning only "little weight" to the opinion of treating physician Bipin Desai, M.D.

(2)  Plaintiff's assigned RFC is not based on substantial evidence, as the ALJ cherry picked and mischaracterized the evidence

(Doc. No. 11 at 16-23).

2

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was 34 years-old at the time of his amended alleged onset date.  (Tr. 57).  He has a high school education and is able to communicate in English.  Plaintiff was employed as a production operator until October 2012 when he had surgery for Chiari malformation.[2]  (Tr. 31).  For various periods of time after surgery and up to June 2013, his surgeon excused him from work.  (Tr. 365, 424, 426, 428, 430, 433).  On June 27, 2013, Plaintiff's pain management doctor ordered him off work until the end of July 2013.  (Tr. 471).  Plaintiff returned to full-time work in a job as a janitor on June 19, 2014.  (Tr. 35, 46).  Plaintiff has requested a closed period of disability from October 20, 2012 (the date of his surgery) until June 19, 2014 (the date he returned to full-time work).  (Tr. 13, 272).

### B.    Medical Evidence

As noted, Plaintiff requested a closed period of disability from October 20, 2012 to June 19, 2014.  For purposes of this appeal, the medical records from that time period are most relevant.  However, in the interest of thoroughness, and because both parties address medical records from outside the relevant period, the Court will review the entire record.

---

[2]     Chiari malformations (CMs) are structural defects in the cerebellum, the part of the brain that controls balance.  Normally the cerebellum and parts of the brain stem sit in an indented space at the lower rear of the skull, above the foramen magnum (a funnel-like opening to the spinal canal).  When part of the cerebellum is located below the foramen magnum, it is called a Chiari malformation. National Institutes of Health, https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Chiari-Malformation-Fact-Sheet.  Last visited October 6, 2017.

3

1.      **Mental Impairments**

**a. February 2011 to August 2012**

Prior to his alleged onset date, from February 2011 to August 2012, Plaintiff received mental health treatment from Bipin Desai, M.D.  (Tr. 439-464).  During that time, Plaintiff variously complained of depression and anxiety (Tr. 439, 442, 452, 455, 462); anger and irritability (Tr. 443); anxiety (Tr. 447, 449, 450, 451); or depression and irritability (Tr. 460). On other occasions, Plaintiff reported that his mood had improved (Tr. 444, 459); that he felt good (Tr. 448, 453, 461); or that he had no psychotic, depressive, or anxiety symptoms (Tr. 445, 454, 464).

Mental status examinations during that time period revealed signs of moderate depression, anxious mood with blunt affect, a sad demeanor, a listless and anergic appearance, and facial expression and general demeanor revealing a depressed mood.  (Tr. 440, 450, 451, 452, 455, 456, 457, 458, 460, 461, 462, 463).  During some visits Plaintiff appeared "near tears," (Tr. 463), and Dr. Desai variously noted that Plaintiff appeared anxious, and/or moderately depressed, with slow and soft speech.  On other occasions, Dr. Desai noted that Plaintiff's behavior had been appropriate and uneventful. (Tr. 445, 454).  Diagnoses included Major Depressive Disorder (moderate, recurrent), Generalized Anxiety Disorder, Cluster C Personality Traits, Social Phobia, and Hypertension, and he was routinely assessed a GAF score of 65.  (Tr. 439-464, *passim*).  Plaintiff was treated with various psychotropic medications including Lamictal, Zyprexa, Klonopin, and Citalopram.  (Tr. 439-464, *passim*).

From February 1, 2012 through July 24, 2012, Plaintiff also saw Vicky Endicott, MSW, for mental health counseling.  (Tr. 318-340).  Mental status examinations routinely revealed

4

Plaintiff to be friendly, happy, attentive, fully communicative, casually groomed, normal weight, but anxious.  (Tr. 318, 322, 324, 328, 330, 332).  His speech was normal, coherent, and spontaneous, and language skills were intact.  (Tr. 318, 322, 324, 326).  On several occasions, his mood was entirely normal with no signs of depression or mood elevation.  (Tr. 318, 326, 328, 333, 334).  However, at other times his demeanor was sad, (Tr. 322), his thought content was depressed (Tr. 324), he was glum, downcast, depressed, and anxious (Tr. 335, 339), or he appeared "near tears." (Tr. 337).  Affect was often appropriate, full range, and congruent with mood.  (Tr. 318, 326, 328, 330). He routinely denied suicidal and homicidal ideation.  (Tr. 318, 322, 324, 326, 328, 330, 333, 334).  His cognitive functioning and fund of knowledge were typically intact and appropriate, as were his short and long term memory and his ability to abstract and do arithmetic calculations.  (Tr. 318).  He was fully oriented, and his vocabulary and fund of knowledge indicated cognitive functioning in the normal range.  (Tr. 318).  His insight and social judgment were fair.  (Tr. 318, 326).  Diagnoses included Major Depressive Disorder (recurrent, moderate), Generalized Anxiety Disorder, and Social Phobia. (Tr. 319-339, *passim*).

On April 27, 2012, Plaintiff was evaluated by Kimberly Stark, Psy.D., who noted that Plaintiff appeared to meet the criteria for depressive episode (recurrent, severe without psychotic features). (Tr. 281-282).

Also pre-alleged-onset-date, Plaintiff presented at the emergency department on three occasions with complaints of depression.  First, on May 22, 2011, Plaintiff presented to Marion General Hospital with a chief complaint of depression.  (Tr. 312-314).  He had thoughts of slashing his wrists.  (Tr. 313).  Plaintiff was admitted to the hospital and later discharged on May 25, 2011.  (Tr. 315-317).  Second, on March 26, 2012, Plaintiff presented to the emergency

5

department reporting depression and indicating that he had intentionally overdosed on Xanax and alcohol.  (Tr. 294).  And lastly, on April 26, 2012, Plaintiff presented at Marion General Hospital with a chief complaint of depression. (Tr. 279).  His diagnoses included Major Depression (severe and recurrent), Dysthymia, Dependent Personality, Chronic Obstructive Pulmonary Disease, Hypertension, Rastric Reflux Disease, and an esophageal ulcer.  (Tr. 280).  Plaintiff was assigned a GAF score of 20.  (Tr. 280).

**b. October 2012 to June 2014**

During the period to which this appeal relates (October 2012 through June 19, 2014), Plaintiff continued mental health treatment with Dr. Desai.  (Tr. 465-468, 503-506, 535-550).  Plaintiff's subjective reports were subject to considerable variation.  In November 2012, Plaintiff complained of depression and vegetative symptoms.  (Tr. 465).  In December 2012, he was feeling better and reported no medication side effects.  (Tr. 467).  In June 2013, he was "feeling pretty good," and he reported that he was recuperating from his surgery.  (Tr. 468).  In September 2013, Plaintiff complained of depression and vegetative symptoms, and he was struggling with chronic back pain.  (Tr. 503).  In October 2013, he was depressed and anxious with vegetative symptoms.  (Tr. 505).  In November 2013, he reported that he was "hanging in there." (Tr. 549).  In December 2013, Plaintiff was "not doing well," and he stated that he was depressed, anxious, and had no appetite.  (Tr. 547).  Later in December, Plaintiff stated that he was feeling a little better and he was looking for a job.  (Tr. 545).  In March 2014, Plaintiff reported that his depression had improved, but he was still anxious, and that he was doing volunteer work and undergoing vocational training.  (Tr. 541).  On April 1, 2014, Plaintiff reported depression, anxiety, and vegetative symptoms.  (Tr. 539).  He also noted that he was

unable to get a job and was in the process of losing his home.  (Tr. 539).  However, on April 29, 2014, Plaintiff stated that he was feeling better and that he got a job as a house cleaner.  (Tr. 537).  On May 27, 2014, Plaintiff again reported that he was feeling good and that he was to start work the next week.  (Tr. 535).

Mental status exams from this period consistently revealed Plaintiff to be friendly, fully communicative, and casually groomed (Tr. 465, 468, 503, 505, 535, 537, 539, 541, 543, 545, 547, 549).  He had no difficulty naming objects or repeating phrases (Tr. 535, 537, 468); no signs of delusions, hallucinations, or bizarre behaviors (Tr. 465, 467, 468, 535); intact associations; intact short and long term memory (Tr. 465); logical thinking; appropriate thought content (Tr. 465, 467, 468, 535); no suicidal or homicidal ideation; and fair insight and social judgment.  (Tr. 465, 468, 535, 503).

During some visits, Dr. Desai's examinations revealed signs of moderate depression, sad demeanor.  (Tr. 465, 503, 505, 539, 543, 547).  Plaintiff's body posture, slowness of movement, facial expression, general demeanor, and attitude often conveyed an underlying depressed mood.  (Tr. 465, 503, 505, 539, 543, 547).  He was at times "downcast" with depressed thought content or "near tears," and it was noted that his speech and thinking appeared to be slowed by depressed mood.  (Tr. 465, 503, 505, 539, 543, 547).

Plaintiff's diagnoses consisted of Major Depressive Disorder (recurrent, moderate); Generalized Anxiety Disorder; and Social Phobia disorder.  He was routinely assigned a GAF score of 55 (with a 65 being the highest score in the previous 12 months).  And he was being treated with various psychotropic medications including Xanax, Zyprexa, Pristiq, Paxil, and others.

### c.      June 2014 to March 2015

Following the period relevant to this appeal, Plaintiff continued treating with Dr. Desai. In October 2014, Plaintiff reported no psychiatric problems or symptoms with no medication side-effects.  (Tr. 533).  Dr. Desai noted that his behavior had been appropriate and uneventful. (Tr. 533).  A mental status examination revealed euthymic mood with no signs of depression or elevation; normal speech; no suicidal or homicidal ideation; no signs of psychotic process; no indications of hallucinations or delusions; no signs of a thought disorder; intact associations, logical thinking, and appropriate thought content; normal orientation, memory, and general cognitive abilities; and intact insight and judgment.  (Tr. 533).  His diagnoses included Major Depression (recurrent, moderate); Generalized Anxiety Disorder; and Social Phobia.  (Tr. 533).

In March 2015, Plaintiff reported that his behavior had been stable and uneventful, and he denied any psychiatric problems or symptoms.  He denied medication side effects, and none were evident.  (Tr. 561).  His mental status examination was normal.  (Tr. 561).

### 2.      Physical Impairments

### a.      February 2011 to August 2012

On December 28, 2011 and, again, on February 13, 2012, Plaintiff presented to Jessica Toland, PA-C, complaining of vomiting and right foot pain.  (Tr. 410, 411).  He was assessed with nausea and vomiting, anxiety, and right foot pain.  (Tr. 410, 411).  On February 21, 2012, he presented to the emergency room with the same complaint.  (Tr. 303).

### b.      October 2012 to June 2014

On October 1, 2012, Plaintiff presented in the emergency room complaining of chest pain, weakness, dizziness, headache, and shortness of breath.  (Tr. 344).  After CT and MRI

scans, he was diagnosed with moderate Chiari malformation.  (Tr. 352, 353).  On October 10,
2012, Plaintiff presented to the emergency room complaining of a headache.  (Tr. 341).  He
reported the previous headache episode from ten days before.  (Tr. 341).  On October 17, 2012,
Plaintiff had surgery for his Chiari malformation.  (Tr. 377).

On October 31, 2012, Plaintiff was evaluated for post-operative physical therapy.  (Tr.
365).  He was tentatively off work until December 10, 2012.  (Tr. 365).  On November 15, 2012,
Plaintiff presented to Ms. Toland for follow-up.  (Tr. 408).  Plaintiff reported that he was doing
well, but he complained of significant fatigue, and he stated that simple tasks were wearing him
out.  (Tr. 408).

On December 4, 2012, Plaintiff reported to his surgeon, J. Brett Fleming, M.D., that he
was attending physical therapy, but that he felt stiffness in his neck.  (Tr. 433).  Dr. Fleming
indicated that Plaintiff was continuing to make progress.  (Tr. 433).  Plaintiff was continued on
physical therapy and was excused from work. (Tr. 433).  On January 14, 2013, Dr. Fleming
cleared Plaintiff to return to work, finding that he was making good progress.  (Tr. 431).  Dr.
Fleming noted that Plaintiff's incision was well-healed; he was alert and oriented; and he was
moving his extremities well.  (Tr. 431).  Plaintiff reported that his symptoms prior to his Chiari
decompression were resolving, and he did not complain of significant neck stiffness or
headaches.  (Tr. 431).

On February 7, 2013, Plaintiff presented to Ms. Toland and complained of dull,
nonradiating back pain.  (Tr. 407).  Physical examination revealed right thoracic paraspinous
musculature with trigger points; normal curvature; and no vertebral tenderness; and motor
function and sensation to light touch were intact.  (Tr. 407).  Plaintiff had imaging of the thoracic

and lumbar spines.  (Tr. 400-01).  Imaging of the cervical spine showed no acute findings or significant degenerative changes as compared to a February 14, 2009 imaging.  (Tr. 402).  On March 1, 2013, Plaintiff again complained to Ms. Toland of dull, nonradiating back pain.  (Tr. 406).  Physical examination revealed the same results as the previous visit.  (Tr. 406).

On March 18, 2013, Plaintiff presented to Dr. Fleming complaining of mid-thoracic back pain that had started about four to six weeks earlier.  (Tr. 428).  Plaintiff noted burning and cramping in his thoracic spine that intensified with ambulation and radiated up and down his back.  (Tr. 428).  Plaintiff also reported numbness in his bilateral hands in all digits and left elbow as well as weakness in his grip in bilateral hands.  (Tr. 428).  Plaintiff indicated that he had been doing heavy lifting at work and was not sure if he had injured his back.  (Tr. 428).  A physical examination revealed that Plaintiff's incision was well healed; he was moving all extremities with full strength; he had decreased dexterity on rapid alternating movements and finger to nose testing; his gait was steady; and he had decreased sensation in the left lateral forearm as well as fingertips compared to the right side.  (Tr. 428).  Dr. Fleming opined that Plaintiff was having changes since his surgery, and he ordered a cervical spine MRI for evaluation of his continued back pain.  (Tr. 428).  He also ordered Plaintiff off work until further evaluation.  (Tr. 428, 430).

On April 2, 2013, Plaintiff again complained of mid-thoracic pain for about eight weeks that he believed to be caused by heavy lifting at work.  (Tr. 427).  He noted burning and cramping that intensified with ambulation.  (Tr. 427).  Dr. Fleming wrote that Plaintiff was having "what [he] felt to be neuropathic changes secondary to decrease in size of the spinal cord syrinx" following his surgery.  (Tr. 427).  He indicated that Plaintiff would have discomfort for a

10

number of months while his spinal cord re-equilibriated.  (Tr. 427).  Dr. Fleming recommended Neurontin.  (Tr. 427).  On April 4, 2013, Plaintiff was ordered off work until May 1, 2013.  (Tr. 426).

On June 11, 2013, Plaintiff presented to Dr. Fleming, again complaining of burning and cramping in his thoracic spine that intensified with ambulation and radiated up and down his spine.  (Tr. 425).  Dr. Fleming noted extremities were at full strength, but Plaintiff had decreased dexterity in rapid alternating movements and finger to nose testing.  (Tr. 425).  Plaintiff had full sensation in his left lateral forearm, which was an improvement over previous testing.  (Tr. 425).  Plaintiff was referred to a pain specialist for his continued complaints of back pain.  (Tr. 425).  On June 19, 2013, Dr. Fleming excused Plaintiff from work until June 28, 2013.  (Tr. 424).

On June 27, 2013, Dr. Yeshwant Reddy, M.D. saw Plaintiff for a pain consultation.  (Tr. 469-71).  Plaintiff described back pain as a three to four on a ten point scale.  (Tr. 469).  A physical examination revealed normal appearance, mood, affect, and orientation.  (Tr. 470).  Posture, transfers, and gait were normal.  (Tr. 470).  Cranial nerve examination was normal. (Tr. 470).  A cervical spine exam revealed a craniectomy and upper C1 laminectomy scar.  His range of motion was reasonable.  Strength, sensation, and reflexes in the upper extremity were normal.  (Tr. 470).  Range of motion in the shoulders was normal.  (Tr. 470).  A thoracic spine examination was normal; lumbar range of motion was normal; and lower extremity neurological examination was normal.  (Tr. 470).  Dr. Reddy explained to Plaintiff that his back pain symptoms were secondary to his surgery and would resolve over time.  (Tr. 470).  He prescribed hydrocodone and advised conservative treatment.  (Tr. 471).  He recommended that Plaintiff consider light or sedentary jobs, and that he not plan to return to manual labor.  (Tr. 471).  He

11

excused Plaintiff from work for one month (until July 28, 2013).  (Tr. 471).  Dr. Reddy

explained to Plaintiff that his surgery was "a great success" and that his current symptoms "are

minor and can be resolved shortly."  (Tr. 471).

On July 23, 2013, Plaintiff reported continued pain in his thoracic spine.  (Tr. 484).  Dr.

Fleming noted that his grip strength continued to improve.  (Tr. 484).  Dr. Fleming concluded

that Plaintiff was improving, with slow progress.  (Tr. 484).  The same day, Plaintiff presented to

Dr. Reddy complaining that the stiffness in his neck had worsened.  (Tr. 487).  He graded his

other symptoms at a six to seven out of ten.  (Tr. 487).  He reported that his most bothersome

symptom was his interscapular pain, which was worse than his lower thoracic back pain and

neck pain.  (Tr. 487).  He also complained of bilateral retroauricular pain and posterior

headaches, which reportedly occurred two to three times per week.  (Tr. 487).  Dr. Reddy

increased Plaintiff's hydrocodone dose.  (Tr. 487).

On January 29, 2014, Plaintiff had a follow-up with Dr. Fleming, who recommended

Plaintiff return in one year for a follow-up MRI to gauge his progress.  (Tr. 527-528).  On

January 31, 2014, Plaintiff complained to Dr. Reddy of continuing back pain.  (Tr. 529).  A

physical examination revealed that Plaintiff's posture, transfers, and gait were normal, and he

was able to heel-to-toe walk.  (Tr. 529).  Cervical spine range of motion was restricted and

painful in all directions.  (Tr. 529).  Dr. Reddy indicated that his pain worsened with bending

twisting, lifting, stretching, prolonged positions, and cervical spine range of motion.  (Tr. 529).

Plaintiff was referred to a movement specialist.  (Tr. 529).

On May 16, 2014, Plaintiff presented to Dr. Reddy with complaints of increased neck and

interscapular pain.  (Tr. 559).  He indicated that he was working a "custodial job with the

12

program that [works] with disabled individuals."  (Tr. 559).  Plaintiff reported that this work

increased his pain.  (Tr. 559).  Plaintiff also reported that he missed his appointment with the

movement specialist.  (Tr. 559).  Plaintiff's cervical spine range of motion was restricted and

painful in all directions.  (Tr. 559).   Dr. Reddy recommended steroid injections.  (Tr. 559).

### c.      June 2014 to March 2015

In August and September 2014, Plaintiff had cervical epidural steroid injections.  (Tr.

553, 555, 557).  On October 17, 2014, Plaintiff complained of neck and back pain, but he

reported that his pain had improved since the injections.  (Tr. 552).  Plaintiff continued to work

as a custodian, and he reported that he had missed an appointment for a steroid injection, and had

been out of his pain medications since September.  (Tr. 552).  Cervical spine range of motion

was restricted and painful with rotation and lateral flexion.  (Tr. 552).  Dr. Reddy recommended

that Plaintiff restart his pain medications.  (Tr. 552).

### C.      Opinion Evidence

On October 14, 2013, Dr. Desai completed a mental impairment questionnaire.  Dr. Desai

opined that Plaintiff had an extreme limitations in the following activities: to complete a normal

workday and workweek without interruptions from psychologically based symptoms; to

maintain attention and concentration for extended periods; and to perform at a consistent pace

without an unreasonable number and length of rest periods.  (Tr. 508-09).  Dr. Desai also opined

that Plaintiff had a marked level of impairment in the following activities: performing activities

without a schedule, maintaining regular attendance, and being punctual within customary

tolerance; interacting appropriately with the general public; accepting instruction and responding

appropriately to criticism from supervisors; responding appropriately to changes in a routine

13

work setting; and dealing with normal work stress.  (Tr. 508-509).  He opined that Plaintiff's

mental impairment caused him to have a marked impairment in restrictions of activities of daily

living and difficulties in maintaining social functioning; and that Plaintiff had an extreme

impairment in maintaining concentration, persistence, or pace.  (Tr. 509).  Dr. Desai anticipated

that Plaintiff would be absent from work more than four days per month.  (Tr. 507).

Reviewing physicians, Drs. Bradley Lewis, M.D. (Tr. 62-64) and Gerald Kylop, M.D.

(Tr. 90-97), found that Plaintiff was capable of light work with occasional overhead reaching and

postural and environmental limitations.  (Tr. 62-64, 90-97).

### D.    Hearing Testimony

At the administrative hearing, Plaintiff testified that he tried to return to his past work,

but was unable to do the required heavy lifting.  (Tr. 31-32).  At the time of the hearing, Plaintiff

continued to perform janitorial work.  (Tr. 35, 46).  He testified that in 2013 and 2014, his doctor

assigned a lifting restriction of not more than twenty-five pounds.  (Tr. 38-39).

The ALJ asked the vocational expert to assume an individual who could perform light

work with the following limitations: the person could only occasionally reach overhead, crawl,

or climb ladders, ropes, or scaffolds; only frequently stoop; have no concentrated exposure to

dust, fumes, and gases; can only understand, remember and carry out simple, repetitive tasks;

maintain concentration and attention for two-hour segments over an eight-hour workday;

respond appropriately to supervisors and coworkers in a task-oriented setting where contact with

others is casual and infrequent; and adapt to simple changes and avoid hazards in a setting

without strict production demands.  (Tr. 48).

14

The vocational expert testified that such a person could not perform Plaintiff's past medium work, but would be able to perform thousands of jobs in the local, state and national economies, such as cleaner, marker, and bagger.  (Tr. 48-49).

### III.  STANDARD FOR DISABILITY

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) and 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) and 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. See 20 C.F.R. §§ 404.1520(d) and 416.920(d).   Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) and  416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2018.

2.  The claimant engaged in substantial gainful activity during the following periods: June 19, 2014 through the date of this decision (20 CFR 404.1520(b), 404.1571 et seq.,416.920(b) and 416.971 et seq.).

3.  However, there has been a continuous 12-month period(s) during which the claimant did not engage in substantial gainful activity. The remaining findings address the period(s) the claimant did not engage in substantial gainful activity.

4.  The claimant has the following severe impairments: Chiari malformation; degenerative disc disease of the cervical spine; degenerative disc disease of the lumbar spine; anxiety; and depression (20 CFR 404.1520(c) and 416.920(c)).

5.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1(20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

6.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: lift/carry 20 pounds occasionally and 10 pounds frequently; sit, stand and walk for 6 hours in an 8 hour workday; occasional overhead reaching; occasional climbing of ladders, ropes or scaffolds; frequent stooping; occasional crawling; no concentrated exposure to dust, fumes and gases; able to understand, remember and carry out simple, repetitive tasks; able to maintain concentration and attention for 2 hour segments over an 8 hour workday; able to respond appropriately to co-workers and supervisors in a task orientated setting where contact with others is casual and infrequent; and able to adapt to simple changes and avoid hazards in a setting without strict production demands.

7.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

8.  The claimant was born on March 17, 1979 and was 34 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

9.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

10.     Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

11.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

12.     The claimant has not been under a disability, as defined in the Social Security Act, from October 20, 2012, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 11-20).

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence de novo, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

17

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307

18

(7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS[3]

**A.      Whether the ALJ's RFC determination is supported by substantial evidence**

Plaintiff maintains that the ALJ's RFC determination is unsupported by substantial evidence, pointing out that the administrative decision omitted a significant and material portion of the record relating to Plaintiff's post-operative medical condition.  Upon review of the record and the parties' arguments, the Court agrees with Plaintiff.  As a consequence, and for the reasons that follow, the Court concludes that this matter should be vacated and remanded.

An RFC determination sets out an individual's work-related abilities despite his or her limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R.§ 416.927(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R.§ 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and must consider all of a claimant's medically determinable impairments, both individually and in combination, S.S.R. 96-8p.

---

[3]      For purposes of analytical clarity, the Court addresses Plaintiff's assignments of error in reverse order.

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."  *Fleischer v. Astrue*, 774 F.Supp.2d 875, 880 (N.D. Ohio 2011) (citing *Bryan v. Comm'r of Soc. Sec.*, 383 Fed.Appx. 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  *See also* SSR 96-8p, at *7, 1996 SSR LEXIS 5, *20 ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.").  While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

In this case, Plaintiff seeks remand on the ground that the assigned RFC was based on the following erroneous conclusions: that Plaintiff quickly recovered from his surgery, with near-total resolution of his symptoms; that Plaintiff's physical examinations were normal after his surgery; and that both Dr. Reddy's and Dr. Fleming's notes supported resolution of symptoms and Plaintiff's ability to return to work at some point after his surgery.  (Doc. No. 11 at 21).  Overall, Plaintiff's position is that the ALJ reached these conclusions by ignoring and otherwise mischaracterizing Plaintiff's post-operative treatment records.

20

The Court agrees.  Based on the ALJ's description of Plaintiff's post-operative records, it would appear that Plaintiff recovered from surgery without any complication.  As stated in the administrative decision,

> In October of 2012, the claimant sought emergency department treatment for numbness on his left side and headaches.  An MRI and CT scan revealed a Chiari malformation with hydrocephalus and an incidental pituitary enlargement (Exhibit 22F, page 2).  On October 17, 2012, the claimant underwent a posterior fossa craniotomy for decompression of the brainstem and a C1 laminectomy (Exhibit 5F , page 21).  Follow [sic] treatment notes demonstrate successful surgery.  On June 27, 2013, the claimant followed up with Dr. Reddy, a treating pain management specialist.  Dr. Yeddy reviewed post-operative imaging of the cervical spine that showed a good decompression.  Dr. Yeddy also indicated that the claimant's major symptoms including headaches and stroke like symptoms resolved completely after surgery.  Dr. Yeddy concluded that surgery had been a great success and the claimant's residual symptoms are minor (Exhibit 13F, pages 2-3).  Dr. Fleming, the claimant's treating surgeon, permitted the claimant to return to work in late June of 2013 (Exhibit 11F, page 1).

> Physical examination findings strongly support the claimant's ability to do work activity consistent with the residual functional capacity finding.  Dr. Reddy examined the claimant on June 27, 2013 and found that the claimant's posture, transfers and gait was normal.  Dr. Reddy also found reasonable cervical range of motion, normal strength, sensation and reflexes in the upper extremities, normal range of motion in the shoulders, normal range of motion of the lumbar spine and a normal lower extremity neurological examination (Exhibit 13F, page 2). Dr. Fleming examined the claimant on July 23, 2013. Dr. Fleming found that the claimant's incision was healing well with full strength in the upper and lower extremities and intact sensation (Exhibit 14F, page 1).  More recently on October 17, 2014, the claimant followed up with Dr. Reddy who noted that the claimant was working as a custodian.  Again, Dr. Reddy found normal posture, transfers and gait along with an ability to heel and toe walk.  Although the claimant's cervical range of motion was restricted, the claimant's upper extremity examination was normal with intact sensation, normal, 5/5 strength and normal reflexes (Exhibit 29F, page 2).

(Tr. 17).  According to the ALJ's timeline, Plaintiff had surgery in October 2012.  Then, in June 2013, Plaintiff had a follow-up appointment with Dr. Reddy, who declared the surgery to be a great success.  A visit to his surgeon in July 2013 revealed nothing remarkable.  And finally, more than a year later, in October 2014, Plaintiff was back to work.

Based on a comprehensive review of the record, the Court concludes that this timeline is not an accurate depiction of Plaintiff's post-operative medical condition and recovery, as the ALJ improperly parsed Plaintiff's medical records and ignored numerous treatment records which reflect abnormal physical examination findings over the course of the year and a half.  Of more than a dozen medical records from this time period, the ALJ considered only three.  The omitted abnormal findings include the following:

- On October 31, 2012, Plaintiff was evaluated for post-operative physical therapy. (Tr. 365).  Plaintiff  reported constant pain in the central and lateral aspect of the neck.  (Tr. 365).  He noted that he lost his grip a couple times, causing him to drop his cigarette.  (Tr. 365).  The physical therapist noted that Plaintiff was in obvious discomfort and that he was allowed activity as tolerated, but should not lift anything greater than ten pounds for the first six weeks of follow-up. (Tr. 365-66).

- On November 15, 2012, Plaintiff presented to Jessica Toland, PA-C, for follow-up. (Tr. 408).  He reported that he was doing well but he complained of severe headaches, significant fatigue, and he stated that simple tasks were wearing him out.  (Tr. 408).

- On December 4, 2012, Plaintiff presented to his surgeon, Dr. Fleming, reporting that he was back to work but complaining of stiffness in his neck.  Dr. Fleming indicated that Plaintiff was making progress, but he excused him from work in order to pursue physical therapy.  (Tr. 433).

- On January 14, 2013, it appeared that Plaintiff was improving.  (Tr. 431). However, on February 7, 2013, Plaintiff presented to Ms. Toland, complaining of dull non-radiating back pain.  (Tr. 407).  Physical examination revealed right thoracic paraspinous musculature with trigger points.  (Tr. 407).

- On March 1, 2013, Plaintiff again complained of dull, non-radiating back pain. (Tr. 406)

- On March 18, 2013 Plaintiff presented to Dr. Fleming complaining of mid-thoracic back pain that had started about six weeks earlier.  Plaintiff noted burning and cramping in his thoracic spine that intensified with ambulation and radiated up and down his back.  Plaintiff also reported numbness in his bilateral hands in all digits and left elbow as well as weakness in his grip in bilateral hands.  (Tr. 428).  A physical examination revealed abnormal findings.  (Tr. 428).

22

Dr. Fleming observed that Plaintiff was having changes since his surgery, and he ordered a cervical spine MRI for evaluation of his continued back pain.  (Tr. 428).  He also ordered Plaintiff off work until further evaluation.  (Tr. 428, 430).

- On April 2, 2013, Plaintiff complained of mid-thoracic pain that had been occurring for about eight weeks.  He believed it was caused by heavy lifting at work.  (Tr. 427).  He again noted burning and cramping that intensified with ambulation.  (Tr. 427).  Dr. Fleming wrote that Plaintiff was having "what [he] felt to be neuropathic changes secondary to decrease in size of the spinal cord syrinx" following his surgery.  (Tr. 427).  He indicated that Plaintiff would have discomfort for a number of months while his spinal cord re-equilibrated.  (Tr. 427).  On April 4, 2013, Plaintiff was again ordered off work until May 1, 2013.  (Tr. 426).

- On June 11, 2013, Plaintiff presented to Dr. Fleming, again complaining of burning and cramping in his thoracic spine that intensified with ambulation and radiated up and down his spine.  (Tr. 425).  Dr. Fleming noted extremities were at full strength, but Plaintiff had decreased dexterity in rapid alternating movements and finger to nose testing.  (Tr. 425).

- On January 31, 2014, Plaintiff complained to Dr. Reddy of continuing back pain.  (Tr. 529).  Cervical spine range of motion was restricted and painful in all directions.  (Tr. 529).  Dr. Reddy indicated that his pain worsened with bending twisting, lifting, stretching, prolonged positions, and cervical spine range of motion.  (Tr. 529).

- On May 16, 2014, Plaintiff presented to Dr. Reddy with complaints of increased neck and interscapular pain.  (Tr. 559).  He indicated that he was working a "custodial job with the program that [works] with disabled individuals."  (Tr. 559).  Plaintiff reported that this work increased his pain.  (Tr. 559).  On physical examination, Plaintiff's cervical spine range of motion was restricted and painful in all directions.  (Tr. 559).

The ALJ fails, at any point in the decision, to acknowledge or address any of these abnormal findings, and instead cites only those post-operative examination findings that support his physical RFC assessment.  As discussed above, an ALJ "may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp.2d at 880 (citing *Bryan*, 383 Fed. Appx. at 148) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity

determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")); *See also Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 Fed. Appx. 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports"); *Hobson v. Berryhill*, 2017 WL 3237788 at * 6 (M.D. Tenn. July 31, 2017) ("The Sixth Circuit has also made clear that an ALJ may not determine the RFC by failing to address portions of the relevant medical record or by selectively parsing that record—i.e., 'cherry-picking' it—to avoid analyzing all of the relevant evidence.")

Here, the ALJ fails to acknowledge the presence of the numerous abnormal examination findings in the record, making no attempt to resolve the inconsistencies between these findings and the specific normal findings cited in the decision.  This "selective parsing" of the record is not appropriate under the foregoing authority.  The ALJ's failure to consider this evidence is particularly problematic because the evidence included treatment notes from two of Plaintiff's treating physicians.  *See Taylor v. Comm'r of Soc. Sec.*, 2014 WL 1874055 at * 4 (N.D. Ohio May 8, 2014) (stating it "is clear that an ALJ may not determine the RFC by failing to address portions of the relevant medical record, or by selectively parsing that record—i.e., 'cherry-picking' it—to avoid analyzing all the relevant evidence.  This is particularly so when the evidence ignored is from a treating physician.).

In addition, the Court finds that in two instances, ALJ did not adequately consider the treatment notes that *were* mentioned in the administrative decision.  First, the ALJ referenced Dr. Fleming's July 23, 2013 treatment note which revealed that Plaintiff's incision was healing well

24

with intact sensation and full strength in the upper and lower extremities.  (Tr. 17).  However, the ALJ failed to acknowledge Dr. Fleming's assertions in the same note that Plaintiff "has been battling with neuropathic pain consistent with a decrease in spinal cord syrinx" and that Plaintiff "still has cramping in his thoracic spine ... [that] radiates up and down his back."  (Tr. 484).  Second, the ALJ supported the assigned RFC with reference to Dr. Reddy's October 17, 2014 treatment note, which noted normal examination findings.  However, the ALJ failed to acknowledge that October 17, 2014 falls outside the relevant closed period.  As such, and especially given the evidence of abnormal findings from inside the relevant period, the Court finds the ALJ's reliance on this treatment note highly questionable.

In her brief on the merits, the Commissioner fails to directly acknowledge that the ALJ did not consider over a years worth of contradictory treatment notes.  Instead, the she highlights the favorable findings in those notes that were explicitly considered, particularly noting the ALJ's observation that according to Dr. Reddy's June 2013 treatment note, Plaintiff's surgery was a "success."  (Doc. No. 13 at 18).  The Commissioner further highlights the favorable aspects of Dr. Fleming's June 2013 treatment note and points out that Plaintiff's surgeon authorized him to return to work in late June 2013.  (Doc No. 13 at 18-19).  The Commissioner also mentions that the opinions of the state agency reviewing physicians provide support for the ALJ's conclusion that Plaintiff was capable of light work.

The Court rejects these arguments as they are not responsive to the issue raised by Plaintiff.  There is no question that the ALJ failed to mention the existence of over a year's worth of medical records.  And under the regulations, "[t]he ALJ has an obligation to consider *all* evidence before him when he mak[es] a residual functional capacity determination, and *must*

*also mention or refute* [...] *contradictory, objective medical evidence presented to him.*"  *Bryan v. Comm'r of Soc. Sec.*, 383 Fed.Appx. 140, 148 (3d Cir. 2010) (emphasis supplied).  The Commissioner has not meaningfully explained how the ALJ's decision does not run afoul of this rule.

Although an ALJ need not discuss every piece of evidence in the record, an ALJ may not selectively include only those portions of the medical evidence that places a claimant in a capable light, and fail to acknowledge evidence that potentially supports a finding of disability.  Courts in this Circuit have not hesitated to remand under such circumstances. *See, e.g., Gentry*, 741 F.3d at 724 (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson*, 313 Fed.Appx. at 777 (finding error where the ALJ was "selective in parsing the various medical reports"); *See also Williams v. Colvin*, 2017 WL 1319781 at * 16 (N.D. Ohio Feb. 1, 2017), report and recommendation adopted by, 2017 WL 1304475 (N.D. Ohio April 7, 2017); *Smith*, 2013 WL 943874 at * 6 ("It is generally recognized that an ALJ "may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.").

Accordingly, and for all the reasons set forth above, the Court finds the ALJ's RFC determination is not supported by substantial evidence.  It is therefore recommended that this matter be remanded for a comprehensive consideration of the record evidence from the relevant period.

**B.** **Whether the ALJ erred by assigning "little weight" to the opinion of Plaintiff's treating physician**

Plaintiff also argues that the ALJ erred by failing to give "good reasons" for giving less than controlling weight to the opinion of Plaintiff's treating psychiatrist, Dr. Desai.  This Court has already concluded that this matter should be remanded for a comprehensive review of the post-operative evidence.  Therefore, and as described in more detail below, the undersigned recommends that the ALJ reconsider Dr. Desai's opinion in light of a complete assessment of the record evidence.

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record."  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).  However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (quoting Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9).

In the present case, the question whether Dr. Desai's opinion is consistent with substantial evidence in the case record has not been adequately answered.  As explained in the above subsection, the ALJ failed to comprehensively review the post-operative evidence.  In order to properly evaluate Dr. Desai's opinion, the ALJ should consider it in light of that review.  Although the Court recognizes that the post-operative evidence relates primarily to Plaintiff's physical impairments and Dr. Desai's opinion relates to his mental condition, a complete review of the evidence may have a significant effect on the ALJ's assessment of Dr. Desai's opinion.

27

One of the reasons that the ALJ discounted Dr. Desai's opinion was that it was inconsistent with evidence of Plaintiff's activities of daily living.  This Court, having duly considered the abnormal findings described in the post-operative records, concludes that those records will shed additional light on the degree to which Plaintiff was capable of engaging in such activities.

Therefore, the Magistrate Judge recommends that on remand, the ALJ evaluate Dr. Desai's opinion in light of a comprehensive review of the post-operative evidence.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED and this matter REMANDED for further proceedings.


_s/ Jonathan D. Greenberg_
Jonathan D. Greenberg
United States Magistrate Judge

Date: October  6, 2017

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

28